Filed 4/29/21  P. v. Smith CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JIMMY RAY SMITH,<br><br>    Defendant and Appellant.<br>_____<br><br>In re JIMMY RAY SMITH,<br><br>    on Habeas Corpus. | B296085<br><br>(Los Angeles County<br>Super. Ct. No. TA051229)<br><br><br><br><br>B305740 |

APPEAL from an order of the Superior Court of Los Angeles County, Tammy Chung Ryu, Judge.  Reversed and remanded with directions.

PETITION for writ of habeas corpus, Superior Court of Los Angeles County, Bob S. Bowers, Jr., Judge.  Granted.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant/Petitioner.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General,  Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Eric J. Kohn, Deputy Attorneys General, for Plaintiff and Respondent.

---

In December 1994, petitioner and appellant Jimmy Ray Smith participated in a robbery-murder during which one of his accomplices shot and killed the victim, Joaquin Arce.  In 2000, a jury found Smith guilty of first degree murder, and also found true the special circumstance allegation that the murder was committed during commission of a robbery.  The trial court sentenced Smith to two terms of life in prison without the possibility of parole (LWOP).  An LWOP sentence is constitutionally impermissible for a non-killer accomplice unless he was a direct aider and abettor who acted with the intent to kill, or acted as a major participant in the underlying offense with reckless indifference to human life.

Years after Smith's conviction, our California Supreme Court clarified the meaning of "major participant" and "reckless indifference to human life."  (*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).)  Still later, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which, among other things, limited accomplice liability under the felony-murder rule.  Senate Bill 1437 also created a procedure by which persons convicted of murder under a now-invalid application of the felony-murder rule

could petition for vacation of their murder convictions. (Pen. Code, § 1170.95.)[1]

In 2019, Smith petitioned in the trial court for vacation of his murder conviction pursuant to Senate Bill 1437. The trial court denied his petition, and Smith appeals. Smith also filed, with the California Supreme Court, a petition for writ of habeas corpus, in which he contended that the jury's special circumstance finding must be reversed because the evidence was insufficient to prove he was a major participant who acted with reckless indifference to human life as those terms have been clarified by *Banks* and *Clark*. In April 2020, the Supreme Court issued an order to show cause (OSC), returnable in this court, requiring the Secretary of the Department of Corrections and Rehabilitation to show cause why Smith is not entitled to relief based on his claim that the evidence was insufficient to support the robbery-murder special circumstance under *Banks* and *Clark*. We ordered that Smith's habeas petition and his appeal be considered together.

We conclude that, in light of *Banks* and *Clark*, the trial evidence was insufficient to prove Smith's conduct supported the robbery-murder special circumstance. Consequently, his section 1170.95 petition must also be granted.

---

[1] All further undesignated statutory references are to the Penal Code.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

1. *The crimes*

On December 18, 1994, at approximately 8:00 p.m., Joaquin Arce, his wife Maria Porcayo, and their two-month-old baby were sitting in Arce's pickup truck, eating their dinner, at a Burger King restaurant parking lot in Los Angeles. The baby was seated between Arce and Porcayo, in a car seat. Arce's truck was outfitted with gold-plated tire rims.

Smith, codefendant Cyril Sibley, Cyril's twin brother Tyril Sibley,[3] and Lavell Hayes, who were all members of the Athens Park Bloods criminal street gang, went to the Burger King and banged on the door. However, the restaurant had just closed so the employees could attend a holiday party. Hayes left the scene at that point.

The testimony of three eyewitnesses or their statements to police, taken together, showed the following. Smith and the Sibley twins approached Arce's truck, with the Sibleys going to the driver's side and Smith going to the passenger side. Smith pounded on the passenger side of the truck; one or both of the Sibley twins pounded on the driver's side. Arce rolled his window partially down and asked what the men wanted. Both Sibley brothers pushed their arms through the driver's side window, struck Arce, and tried to open the door. Arce tried to drive away, but the truck's engine stalled after he went a short distance.

---

**2**     At Smith's request, we have taken judicial notice of the record in his direct appeal, including our unpublished opinion. (Evid. Code, §§ 451–453.)

**3**     For ease of reference, we hereinafter refer to Tyril Sibley by his first name, and Cyril Sibley by his last name.

Sibley tripped and fell as Arce began backing out, but he got up, returned to the truck, and resumed striking Arce. Tyril pushed a gun into the truck's cab and shot Arce at point blank range. Arce gasped, "They got me," and "I can't make it." The Sibley twins pulled Arce from the truck and kicked him as he lay on the ground. Smith moved to the driver's side of the truck with the other two assailants, and all three stood over Arce and stared at him as he lay on the ground.

Meanwhile, Porcayo grabbed the baby, exited the vehicle, and screamed at the assailants to take the truck. The trio did so, with Smith driving. As they were driving off, Arce stood up, raised his hands in the air, and walked toward Porcayo. Assuming Arce was okay, Porcayo ran to the Burger King's outside payphones to call for help. However, Arce then fell to the ground, and never got up again. The gunshot was a contact wound that entered Arce's left upper arm and travelled into his chest. He died of his injuries.

Approximately a half hour after the shooting and robbery, a witness saw a group of men standing near the stolen pickup truck in an apartment complex parking lot located approximately a mile from the Burger King. The Sibleys and Hayes were in the group. Police thereafter found Arce's truck in the lot, with the gold tire rims removed and in the truck bed. On the front seat was a baby blanket that had been damaged by a bullet. A fingerprint found in the car was identified as Smith's. A shoe print in a planter near the truck matched a pair of shoes belonging to Hayes. The bullet, the gun, and the baby's car seat were never recovered. An eyewitness told a detective that Sibley appeared to be under the influence of drugs or alcohol. Urine

5

samples taken from the twins the night of the shooting tested positive for the presence of PCP.

Prior to trial, Tyril was killed in an unrelated shooting.

2. *Convictions, appeal, and habeas petitions*

A jury found Smith and Sibley guilty of the first degree murder of Arce, with true findings on the allegation that a principal was armed and the special circumstance allegation that the murder was committed while defendants were engaged in the commission of a robbery. (§§ 187, subd. (a), 12022, subd. (a)(1), 190.2, subd. (a)(17).) It further found both defendants guilty of the carjackings of Arce and Porcayo (§ 215, subd. (a)) and the second degree robbery of Arce (§ 211), with principal-armed enhancements. (§12022, subd. (a)(1).) The jury additionally found Sibley guilty of the second degree robbery of Porcayo. The jury was instructed on both direct aiding and abetting principles, and felony murder.

In a bifurcated proceeding, the trial court found Smith had suffered a prior "strike" conviction for assault with a firearm. It sentenced him to two consecutive LWOP terms, plus six years.

This court affirmed Smith's convictions in 2002. (*People v. Smith, et al.* (Sept. 30, 2002, B144995) [nonpub. opn.].) This court concluded that the trial court committed instructional error by failing to instruct that if Smith and Sibley were not the actual shooters, the jury could find the section 190.2 special circumstance true only if it concluded that they intended Arce be killed, or if they acted as major participants in the robbery, with reckless indifference to human life. However, we found the error harmless beyond a reasonable doubt, because there was overwhelming evidence to prove these elements. (*People v. Smith, et al., supra*, B144995.) We also concluded that the trial

6

court had erred by doubling Smith's LWOP term pursuant to the Three Strikes law, and ordered that one of the terms be stricken. The California Supreme Court denied review in December 2002.

In 2018, Smith filed a petition for writ of habeas corpus in the trial court, contending that there was insufficient evidence to support the special circumstance finding because the evidence did not prove he was a major participant in the robbery who acted with reckless indifference to human life. The trial court denied the petition, relying on the conclusion in this court's 2002 opinion that the evidence was overwhelming.

Smith next filed a habeas petition in this court, making the same argument. We summarily denied it in November 2018.

Smith then sought relief on the same grounds in the California Supreme Court. On April 29, 2020, the Supreme Court issued an OSC, returnable in this court, requiring the Secretary of the Department of Corrections and Rehabilitation to show cause why Smith is not entitled to relief based on his claim that the evidence was insufficient to support the robbery-murder special circumstance under *Banks* and *Clark*.

3. *Smith's section 1170.95 petition*

On January 2, 2019, Smith filed a petition for resentencing pursuant to section 1170.95. Using a preprinted form, he checked boxes stating that a charging document had been filed against him allowing the prosecution to proceed under a felony-murder theory or the natural and probable consequences doctrine; he was not the actual killer; he did not aid and abet the killing with the intent to kill; he was not a major participant in the felony or did not act with reckless indifference to human life; and he could not now be convicted of first degree felony murder in

7

light of changes to the law wrought by Senate Bill 1437. He also checked a box requesting the appointment of counsel.

On February 4, 2019, the trial court denied the petition. Smith was not present and was not represented by counsel. The court reasoned that, under section 189, subdivision (e), a participant in a murder is liable even if he was not the actual killer, but was a major participant in the underlying felony and acted with reckless indifference to human life. "In this matter, the Court of Appeal specifically found that the evidence in the case overwhelmingly suggested that the petitioner acted as a major participant and with reckless indifference to human life in the underlying felonies of robbery and carjacking. Therefore, petitioner is ineligible for resentencing under Penal Code section 1170.95."

Smith filed a timely notice of appeal.

## DISCUSSION

1. *The habeas petition*

Because resolution of Smith's writ petition is dispositive of his direct appeal, we address it first.[4]

---

[4] The People have not filed a return in response to the habeas petition; instead they address the question of whether the evidence showed Smith was a major participant who acted with reckless indifference to human life in their brief in Smith's direct appeal. Smith argues that in light of the People's failure to file a Return, they must be deemed to have admitted all the allegations of his petition, which must therefore be granted. Because we grant the habeas petition on the merits, we do not address Smith's contentions on this point.

a. *The special circumstance statute, the* Enmund-Tison *continuum, and* Banks *and* Clark

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole.  Participating in a murder during a robbery is one of these circumstances.  (§ 190.2, subd. (a)(17)(A).)  For defendants who did not kill and lacked the intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery."  (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)  The statute thus imposes both an actus reus requirement (major participation) and a mens rea requirement (reckless indifference to human life). (*Scoggins*, at p. 674.)  Section 190.2, subdivision (d) codifies the holdings of *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), which brought California law "into conformity with prevailing Eighth Amendment doctrine."  (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; *Clark*, *supra*, 63 Cal.4th at p. 609; *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004–1005.)[5]

*Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver

---

[5]     "Although these standards were developed in death penalty cases, they apply equally to cases involving life imprisonment without the possibility of parole under section 190.2, subdivision (d)."  (*In re McDowell*, *supra*, 55 Cal.App.5th at pp. 1004–1005; *Banks*, *supra*, 61 Cal.4th at p. 804.)

who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state. (*Enmund*, *supra*, 458 U.S. at pp. 798, 801; *Scoggins*, *supra*, 9 Cal.5th at p. 675.)

*Tison*, in contrast, did not preclude imposition of the death penalty for two defendants, brothers who had helped their father and his cellmate—both convicted murderers—escape from prison. The brothers locked up the prison guards and armed the two prisoners during the escape. (*Tison*, *supra*, 481 U.S. at p. 139.) A few days later, the group got a flat tire. One of the brothers flagged down a passing car for help. The group then kidnapped at gunpoint the family of four that was in the car, robbed them, and drove them into the desert. The Tisons' father and his cellmate debated whether to kill the family. The sons stood by while the father and cellmate shot the victims repeatedly. The perpetrators left the family—which included a toddler and a teenager—to die in the desert, and drove off in the family's car. (*Id.* at pp. 139–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at pp. 152, 157–158.)

*Enmund* and *Tison* illustrate the constitutional limits for punishing accomplices to felony murder and establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and neither intended to kill nor had any culpable mental state, at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675; *Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.)

10

"Somewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's, lies the constitutional minimum" required for the imposition of a sentence of death or life without the possibility of parole. (*Banks*, at p. 802.) *Tison* and *Enmund* did not establish a ceiling or a floor for determining when an aider and abettor is eligible for such a sentence, however. The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply. The question is one of degree. (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.)

In *Banks* and *Clark*, our state Supreme Court clarified the meaning of the "major participant" and "reckless indifference to human life" requirements. *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant[.]" (*Banks*, *supra*, 61 Cal.4th at p. 794.) The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

11

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant or acted with reckless indifference. (*Banks*, *supra*, 61 Cal.4th at pp. 805, 807–808.) No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting, or could have prevented it. (*Id.* at pp. 805–807.) He was "no more than a getaway driver," like Enmund. (*Id.* at p. 805.)

The following year, in *Clark*, the court turned its attention to the "reckless indifference" determination. (*Clark*, *supra*, 63 Cal.4th at pp. 610–623.) Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Clark*, at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.) Recklessness has both a subjective and an objective component. Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' [Citation.]" (*Ibid.*) The fact a robbery involved a gun or carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617–618; see *Scoggins*, *supra*, 9 Cal.5th at p. 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate

12

lethal force might be used' is not sufficient to establish reckless indifference to human life." '].)

*Clark*, like *Banks*, listed various factors to be considered when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)

Based on these factors, *Clark* concluded that the defendant there did not act with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind" who planned and organized a computer store robbery, and waited across from the store's parking lot while his accomplices carried it out. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed, when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 613, 620–622.) However, during the robbery the mother of one of the employees—who had come to pick him up from work— entered the store, surprising the robbers, and Clark's accomplice shot her. (*Id.* at p. 539.) As police cars arrived, Clark fled the scene, leaving the shooter behind. *Clark* concluded that the defendant—who was not armed, was not physically present in the

13

store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and use of an unloaded gun—did not act with reckless indifference to human life. (*Id.* at pp. 611, 618–623; *Scoggins*, *supra*, 9 Cal.5th at p. 676.)

Most recently, our Supreme Court considered the reckless indifference inquiry in *Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery, in which one of his accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at p. 671.) There, the defendant was swindled by the victim in regard to a sale of television sets. To exact revenge, Scoggins recruited two close friends to ambush the victim and " 'beat the shit' " out of him, while Scoggins waited at a nearby gas station. (*Id.* at pp. 671, 678.) As planned, the encounter with the victim occurred in daylight, in a strip mall parking lot. When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) Scoggins was not present at the scene of the murder, was not in a position to restrain his accomplices, did not know a gun would be used or plan that the victim would be killed, attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and acted ambiguously after the shooting. (*Id.* at pp. 678–683.)

b. *Scope of review*

A defendant whose special circumstance determination predated *Banks* and *Clark* may challenge the sufficiency of the evidence of the finding by means of a habeas corpus petition. (*Scoggins*, *supra*, 9 Cal.5th at pp. 673–674.) "Where a decision

14

clarifies the kind of conduct proscribed by a statute, a defendant whose conviction became final before that decision 'is entitled to post-conviction relief upon a showing that his [or her] conduct was not prohibited by the statute' as construed in the decision. [Citation.] 'In such circumstances, it is settled that finality for purposes of appeal is no bar to relief, and that habeas corpus or other appropriate extraordinary remedy will lie to rectify the error[.]' " (*Ibid.*)

"When a defendant seeks habeas corpus relief, the underlying judgment is presumed valid" (*In re Bennett*, *supra*, 26 Cal.App.5th at p. 1018), and we view the facts favorably to the prosecution. (*In re Parrish* (2020) 58 Cal.App.5th 539, 541.) "In a habeas corpus challenge to the sufficiency of the evidence to support a special circumstance finding, the 'standard of review . . . is whether, when evidence that is reasonable, credible, and of solid value is viewed "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." [Citations.] The standard is the same under the state and federal due process clauses. [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial.' " (*In re Bennett*, at p. 1018; *In re McDowell*, *supra*, 55 Cal.App.5th at p. 1008; *In re Miller*, *supra*, 14 Cal.App.5th at p. 974; *In re Loza, supra*, 10 Cal.App.5th at p. 46.)

Determination of whether the evidence demonstrates reckless indifference and major participation is a "fact-intensive and individualized inquiry" (*In re Parrish*, *supra*, 58 Cal.App.5th at p. 542) in which we consider the totality of the circumstances. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The *Banks* and *Clark*

15

factors overlap, and " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark, supra*, 63 Cal.4th at pp. 614–615, 618; *Banks, supra*, 61 Cal.4th at p. 803.)  Smith "is entitled to habeas corpus relief ' "if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." ' [Citation.]" (*Scoggins, supra*, 9 Cal.5th at p. 676.)

As noted, at Smith's request, we have judicially noticed the record in his direct appeal.  Because our 2002 opinion was issued without the benefit of *Banks* and *Clark*, we do not limit our review to our prior opinion in the case, but also consider pertinent parts of the record. (*In re Taylor* (2019) 34 Cal.App.5th 543, 556–557.)

c. *The evidence was sufficient to establish Smith was a major participant in the robbery, but insufficient to establish he acted with reckless indifference to human life*

(i)  *Major participation*

Applying these principles here, we conclude the evidence was sufficient to prove Smith was a major participant in the robbery.  Smith was present during the entire robbery and murder, from start to finish.  The fact Smith coordinated his actions with his accomplices demonstrates he knew of the plan to carjack Arce and intended to, and did, assist in that goal.  The trio coordinated their actions:  they simultaneously approached Arce's truck and went to opposite sides of the vehicle to surround it.  They then accosted the victims simultaneously, with Smith pounding on the passenger side window and the twins forcing

16

their arms into the cab to hit Arce.[6] Smith's conduct was partially responsible for causing Arce to roll down the truck's window, allowing the twins access to him. After the fatal shot was fired and Arce was on the ground, Smith stood over and stared at him. He then drove his cohorts away in the truck, leaving Arce wounded in the parking lot.[7] (See *In re Parrish, supra*, 58 Cal.App.5th at p. 543 [defendant who participated in each stage of the robbery was a major participant]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant was willingly involved in the violent manner in which the robbery took place]; *People v. Law* (2020) 48 Cal.App.5th 811, 825, review granted on another ground July 8, 2020, S262490 [same]; *In re Loza, supra*, 10 Cal.App.5th at p. 50 [finding "particularly

---

[6] Smith characterizes as mere conjecture this Division's conclusion, in the 2002 unpublished opinion, that the trio's coordinated actions indicated the crime was preplanned. We disagree. The only reasonable inference from the evidence was that the men planned and agreed to commit the robbery-carjacking, albeit quickly. The fact there was no direct evidence to prove a plan is immaterial. Circumstantial evidence may be sufficient to prove guilt beyond a reasonable doubt. (*People v. Jones* (2013) 57 Cal.4th 899, 961; CALCRIM No. 223.)

[7] Smith suggests that Tyril, the "man with the gun," got in the driver's seat and Smith and Sibley were passengers when they drove the truck away. However, eyewitness Chires selected Smith's photograph from a pretrial six-pack lineup and stated that he drove the truck when the assailants left. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence Smith was the driver. In any event, the salient point is that Smith proceeded with the carjacking, despite the fact his accomplice had just shot Arce.

17

significant in determining petitioner's status as a major participant his physical presence at the scene, involvement in the actual robbery, and inaction either in attempting to prevent the shootings or in assisting the victims"].)

(ii)  *Reckless indifference to human life*

However, we cannot conclude, in light of our Supreme Court's clarifications in *Banks* and *Clark*, that the evidence was sufficient to show Smith acted with reckless indifference to human life.

As we have observed, the *Banks* and *Clark* factors overlap. "[F]actors demonstrating petitioner's role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference." (*In re Loza, supra,* 10 Cal.App.5th at p. 52.)  "Generally, the greater the defendant's participation in the felony murder, the more likely he or she acted with reckless indifference to human life." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 147; *Clark, supra,* 63 Cal.4th at p. 615.) Accordingly, we consider the factors articulated by *Banks*, as well as by *Clark*.

First, there was no evidence that Smith played a significant role in planning the crime.  It appears that the Sibley twins and Smith spontaneously decided to rob Arce, moments after finding the Burger King closed and noticing Arce's truck, with its gold rims, in the parking lot.  Certainly, as noted, the group must have agreed to commit the robbery and had a rudimentary plan— hatched in the minutes or moments after they found the Burger King closed—as evidenced by their coordinated actions.  But given the timing, there could have been little actual planning involved.  More to the point, there was no indication that Smith

18

was the instigator or directed the other perpetrators in the effort to rob Arce.  (See *In re Ramirez*, *supra*, 32 Cal.App.5th at p. 404.)

The evidence regarding weapon use likewise does not weigh in favor of a finding of reckless indifference.  Only one weapon— that wielded by Tyril—was used, and there was no evidence Smith supplied it.  There was no evidence Smith was armed with or used a gun or another weapon.

Assuming Smith knew that Tyril was carrying a gun, there was no evidence he knew Tyril planned on actually using it. Where " 'the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force,' " the " ' "defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state." ' "  (*Scoggins*, *supra*, 9 Cal.5th at p. 678.)  But here, Tyril did not initially display the gun, suggesting there was no plan to shoot.  The only witness who saw where the gun came from told police that Tyril retrieved it from his own waistband during the carjacking, as Arce was trying to fend off the assailants.  Prior to the actual shooting, Tyril does not appear to have done anything that indicated he was contemplating using lethal force.  The fact Tyril did not display or use the gun at the start of the carjacking undercuts the inference that Smith should have anticipated Tyril would fatally shoot the victim.  (See *In re Taylor*, *supra*, 34 Cal.App.5th at pp. 557–558 [even assuming there was substantial evidence defendant knew his accomplice was armed, "there is little about [defendant's] use or knowledge of firearms that suggests he appreciated the planned robbery posed a heightened risk of death"]; *Scoggins*, *supra*, 9 Cal.5th at p. 677 [fact Scoggins did not know his accomplice would use a gun suggested he was "far less culpable"

than the Tison brothers].)  The "mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618.)

Next, a "defendant's knowledge of a confederate's likelihood of using lethal force, which may be evidenced before or during the felony, is significant to the analysis of the defendant's mental state." (*Scoggins, supra*, 9 Cal.5th at p. 681; *Clark, supra*, 63 Cal.4th at p. 621.)  There was a dearth of evidence showing Smith knew Tyril was prone to violence, or that he was likely to use lethal force.  There was no evidence Smith had previously committed crimes with Tyril.  There was no showing Smith knew Tyril had committed a shooting or attacked someone with a weapon before.  There was not even evidence presented regarding the primary activities of the men's gang.  (See *Banks, supra*, 61 Cal.4th at pp. 788, 796, 810–811 [although some of getaway driver's cohorts in armed robbery were gang members, there was no evidence they had killed before]; *In re Miller, supra*, 14 Cal.App.5th at p. 976 ["[e]ven though defendant and [the killer] belonged to the same gang and had committed follow-home robberies together in the past, '[n]o evidence indicated [they] had ever participated in shootings, murder, or attempted murder' "]; *In re Taylor, supra*, 34 Cal.App.5th at p. 558 [no evidence defendant was aware of his accomplice's propensity for violence, despite knowledge of accomplice's involvement in illegal activity including drug sales]; *In re Ramirez, supra*, 32 Cal.App.5th at p. 405.)

The "duration of the crime also counsels against finding defendant exhibited reckless indifference to human life." (*In re Miller, supra*, 14 Cal.App.5th at p. 975.)  "Where a victim is held

at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation] possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620; *Scoggins*, *supra*, 9 Cal.5th at p. 680 [prolonged restraint of the victim can indicate reckless indifference to human life, because it provides a greater opportunity for violence].)  Here, the duration of the incident was short; it transpired over the course of only a few minutes, and does not support a reckless indifference finding.  (See *Clark*, at p. 620 ["although the planned robbery was to be of substantial duration . . . the period of interaction between perpetrators and victims was designed to be limited"]; *Scoggins*, *supra*, 9 Cal.5th at p. 681 [fact interaction with victims lasted up to five minutes, rather than a prolonged period, did not weigh in favor of reckless indifference finding].)

In a related vein, evidence that a defendant had the opportunity to act as a restraining influence on his murderous cohorts, but failed to do so, supports a reckless indifference finding.  (See *Scoggins*, *supra*, 9 Cal.5th at p. 678 [" ' "the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts" ' "]; *People v. Law*, *supra*, 48 Cal.App.5th at p. 825, rev.gr. ["Being at the scene of the shooting, [defendant] could have tried to stop his accomplice's violent behavior or to help the victim once he had been shot, but he did neither"]; *In re Loza*, *supra*, 10 Cal.App.5th at pp. 53–54.)  Such an opportunity cannot fairly be ascribed to Smith here.  Smith was on the opposite side of the truck from the Sibley twins before and when Tyril shot Arce.  As noted, Tyril did not pull out his gun until midway through the carjacking.  There is no evidence from which we could logically infer Smith immediately

21

saw the weapon at that point, as he was on the opposite side of the truck.  Even if he had observed it, it appears unlikely he would have had sufficient time to move to the driver's side and disarm Tyril before Tyril could fire the fatal shot.[8]  (See *Clark*, *supra*, 63 Cal.4th at p. 621 [explaining that in *Tison*, *supra*, 481 U.S. at p. 140, the brothers had "advance notice" that their father might shoot the kidnapped family because he stated he was thinking about killing them].)  Here the shooting appears to have been impulsive and spontaneous, rather than an expected part of the robbery, giving Smith less opportunity to restrain Tyril from using the weapon.  (See *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558 [reckless indifference absent where the evidence tended to show shooting was a " 'somewhat impulsive' response to the victim's unexpected resistance, as opposed to the culmination of a

---

[8]    As recounted to a Los Angeles County Sheriff's sergeant by an eyewitness, the Sibley twins stuck their arms through the truck's driver's side window, struggling with or striking Arce.  Arce backed the truck up.  As he did so, the Sibleys continued reaching into the cab and striking him.  Sibley tripped and fell.  At that point, Tyril reached into his waistband, pulled out his gun, and stuck it inside the window, which was halfway down.  Sibley got up and returned to the truck, which was at that point moving forward.  The record does not disclose the precise amount of time that elapsed between Tyril's pulling the gun and firing the shot.  But according to Porcayo, when or just before the truck stalled, the gunman forced the gun into the truck cab.  Arce tried to push the gun away.  He tried to restart the truck, and then said he had been shot.  Thus, the time elapsed between Tyril's pulling out the gun and firing it could not have been lengthy.

prolonged interaction that increased the opportunity for violence"]; *In re Miller*, *supra*, 14 Cal.App.5th at p. 975.)[9]

Smith's actions after the shooting were somewhat ambiguous. (*Scoggins*, *supra*, 9 Cal.5th at p. 679 ["A defendant's actions after the shooting may also bear on the defendant's mental state"].) As this Division observed in the 2002 opinion, Smith did not express surprise or concern about the shooting, suggesting reckless indifference. Since this court's 2002 opinion was issued, however, our Supreme Court has provided additional guidance on this question. In *Clark*, the defendant waited across the store's parking lot in a BMW while his accomplice, Ervin, armed with a gun, handcuffed the employees inside the store and then shot the victim. A nearby police officer heard a gunshot and saw Ervin run from the store toward the BMW. When Ervin reached the BMW and tried to enter, Clark drove away, leaving Ervin behind. (*Clark*, *supra*, 63 Cal.4th at pp. 535–537, 612, 619.) *Clark* reasoned that defendant's abandonment of his accomplice could "be interpreted either as defendant's rejection of Ervin's actions in committing the shooting or as defendant's desire to flee the scene as quickly as possible, without regard for Ervin's welfare or that of the shooting victim. But, unlike in [*Tison*], defendant would have known that help in the form of police intervention was arriving. Defendant's absence from the scene of the killing and the ambiguous circumstances

---

[9]     *Clark* also focused on whether and what efforts the defendant made to minimize the risks of violence during the felony. (*Clark, supra,* 63 Cal.4th at pp. 621–622.) Here, this factor appears neutral. As described, the carjacking was planned on the spur of the moment, and no evidence suggests Smith either took steps to minimize the risk of violence, or heighten it.

surrounding his hasty departure make it difficult to infer his frame of mind concerning [the victim's] death." (*Id.* at p. 620.)

In *Scoggins*, the defendant waited at a gas station while his accomplices carried out the planned assault nearby; one of them unexpectedly shot the victim. (*Scoggins*, *supra*, 9 Cal.5th at pp. 671–672, 678.) After the shooting, Scoggins walked over to the victim, checked if he was breathing, and spoke with officers at the crime scene. (*Id.* at pp. 672, 680.) The People argued that Scoggins's quick arrival on the scene showed "he had anticipated the shooting and was thus unfazed by it." (*Id.* at p. 680.) Relying on *Clark*, *Scoggins* reasoned: "we have said that when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*Scoggins*, at p. 679.) As in *Clark*, the "ambiguity inherent" in Scoggins's post-shooting actions made it difficult to infer his frame of mind. (*Scoggins*, at p. 680.) "Scoggins's calm behavior after the shooting might indicate that he had anticipated the use of lethal force and was thus not entirely shocked by the deadly turn of events. Alternatively, Scoggins's actions might indicate that he in fact intended to check on [the victim] and render aid. At the very least, his behavior could suggest that he had not planned for his accomplices to kill [the victim]; that is, he might have stayed at the crime scene precisely because he did not think he was culpable for [the victim's] death. Overall, Scoggins's actions after the shooting do not weigh substantially in favor of a finding of reckless indifference to human life." (*Ibid.*)

Here, in light of *Clark* and *Scoggins*, we conclude Smith's actions were similarly ambiguous, notwithstanding our duty to review the evidence in the light most favorable to the judgment.

(*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Smith's silent reaction could have suggested that he was unsurprised by the shooting.  But it is also a reasonable inference that he had not expected lethal force to be used, and was nonplussed by Tyril's lethal use of the gun.  He did not, like the Sibley twins, kick or physically assault Arce, nor can his actions be interpreted as ratification of the shooting.  In light of this ambiguity, we cannot conclude that his actions after the shooting weigh in favor of a finding of reckless indifference.

Courts have relied on the fact that the defendant failed to aid a wounded victim as a factor showing reckless indifference. (See *Clark*, *supra*, 63 Cal.4th 619 ["appellate courts have considered relevant a defendant's failure to provide aid while present at the scene"]; *In re Parrish*, *supra*, 58 Cal.App.5th at p. 544 [reckless indifference shown in part by fact petitioner "did not pause . . . to aid or comfort the victim"]; *People v. Douglas*, *supra*, 56 Cal.App.5th at p. 10 [petitioner took no steps to remedy or reduce harm after shooting; he "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)  Here, Smith did nothing to aid Arce.  But, his failure is mitigated somewhat by the fact Porcayo was present and able to call for help.  And, there is no evidence Smith appreciated how badly Arce was wounded.  The gunshot was a contact shot to Arce's arm, not his head or chest; however, it went through his upper arm and entered his left chest. Porcayo testified that as the assailants drove away in the truck, Arce was standing up, and she thought he was "fine."  (See *In re Taylor*, *supra*, 34 Cal.App.5th at p. 559.)

The strongest factor weighing in favor of a reckless indifference finding is Smith's presence at the crime scene.

"Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia*, *supra*, 46 Cal.App.5th at p. 148; see *People v. Law*, *supra*, 48 Cal.App.5th at p. 825, rev.gr. ["we are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting did not meet the standard in section 190.2, subdivision (d). The defendants who have been able to get their special circumstance findings vacated under *Banks* and *Clark* are those who were not wielding guns themselves *and also not present for the shooting* (either because they were acting as getaway drivers or because they were involved in the planning of the crime only)", italics added]; *People v. Murillo* (2020) 54 Cal.App.5th 160, 172–173, review granted on another ground Nov. 18, 2020, S264978 ["In *Banks* and *Clark*, and in other cases in which a court has overturned a special circumstance finding, the defendant either was not present at the scene of the killing, or at least was not capable of preventing his cohort from acting."].) Here, of course, Sibley did not use a gun.

Our research has uncovered no published case in which a defendant who was present at the scene for the duration of the crime was found to lack reckless indifference to human life. But by the same token, our research has not uncovered any case in which the evidence supporting a reckless indifference finding was quite as limited as that presented here. In contrast, such cases have involved more compelling evidence. (See, e.g., *People v. Douglas*, *supra*, 56 Cal.App.5th at pp. 9–11 [robbery was defendant's brainchild; he planned to use a loaded gun; he directed his accomplices' actions during the offense; and a few days later he conducted another armed robbery with the same gun partner]; *In re Parrish*, *supra*, 58 Cal.App.5th at p. 544

[petitioner knew guns would be used in robbery and supplied one; knew his cohorts were not peaceable; and had the opportunity to restrain them but did not]; *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089 [reckless indifference shown where defendant "cooked up a plan to break into the home of a known drug dealer while they were home and to use force, including firearms, to steal the dealer's product," and personally used a weapon to keep some victims at bay, enabling the murder to occur in another room]; *People v. Murillo*, *supra*, 54 Cal.App.5th at p. 172, rev.gr. [defendant instructed his compatriot to fire the gun]; *In re McDowell*, *supra*, 55 Cal.App.5th at pp. 1013–1014 [petitioner was armed with and brandished a knife, "chose to plan and lead a crime with a particularly high risk of violence—a home invasion robbery of a drug dealer," and did not intervene when accomplice fired warning shot and victim said " 'kill me if you're going to kill me.' "]; *People v. Law*, *supra*, 48 Cal.App.5th at p. 825, rev.gr. [defendant broke into the victim's house armed, used a gun to threaten the victim, and did not intervene when accomplice pistol whipped the victim]; *People v. Garcia*, *supra*, 46 Cal.App.5th at pp. 146–148 [reckless indifference shown where defendant planned home invasion robbery that lasted at least 40 minutes, provided duct tape to bind and gag the victim, which asphyxiated him, hit another victim in the face, causing an injury that required stitches, and disconnected phones to prevent the victims calling for help]; *In re Loza*, *supra*, 10 Cal.App.5th at pp. 52–54 [reckless indifference shown where defendant suggested the robbery, supplied accomplice with a gun, knew accomplice claimed to have killed someone earlier that morning, and failed to intervene when accomplice "counted down" while threatening to shoot the store clerk]; *People v. Medina* (2016)

27

245 Cal.App.4th 778, 792 [defendant played a role in planning the criminal enterprise, had and used a gun, and his prior experience with accomplice gave him an awareness of danger and risk of death].)

Thus, while the showing of reckless indifference was not as weak as in *Enmund*, it falls closer on the continuum to that case than to *Tison*. Certainly, we do not minimize Smith's atrocious behavior. Carjacking a vehicle occupied by a young family and a baby is abhorrent. But, given the totality of the circumstances, under *Banks* and *Clark* nothing in the evidence "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.) We conclude the evidence was insufficient to prove the special circumstance allegation after *Banks* and *Clark*.[10]

---

[10] This Division's 2002 opinion concluded the evidence overwhelmingly established reckless indifference for several reasons, most of which are no longer tenable after *Banks* and *Clark*. The opinion reasoned that carjacking was an inherently dangerous and heinous felony, and the potential for death results from the very presence of a firearm at the scene of a crime. But our Supreme Court has since made clear that the mere presence of a firearm—and, indeed, the foreseeable risk of death in an armed robbery—is insufficient to prove reckless indifference. " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life[.]" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; *Banks*, *supra*, 61 Cal.4th at p. 808; *Clark*, *supra*, 63 Cal.4th at pp. 617–618 [the fact a robbery involves a gun is insufficient, by itself, to support a finding of reckless indifference].). The Supreme Court has also held that the fact a felony is inherently dangerous, and is listed in section 189, does not necessarily demonstrate reckless indifference. (*Banks*, at p. 810 ["Whether a category of crimes is sufficiently dangerous to

28

## 2. *Smith's section 1170.95 petition*

As noted, Smith has also appealed the trial court's denial of his petition, pursuant to section 1170.95, for vacation of his murder conviction and resentencing.  He contends that his section 1170.95 petition was facially sufficient and established a prima facie case for relief, statutorily entitling to him to the appointment of counsel and requiring the court to consider briefing.  The trial court also erred, he argues, by considering this court's prior opinion in the case, an action he characterizes as an "ex parte investigation."  Further, he posits that because his jury was not instructed on the major participant/reckless indifference requirement, the true finding on the special circumstance does not render him ineligible for relief as a matter of law, nor does this court's pre-*Banks* and *Clark* finding that the instructional error was harmless.  And, he urges, the failure to appoint counsel also violated his constitutional rights to counsel at all critical stages of the proceeding, and to procedural and substantive due process.  These errors, he asserts, amounted to prejudicial and structural error, requiring reversal.  Because we have now concluded that the evidence is insufficient, under *Banks* and *Clark*, to support the special circumstance finding, we need not reach these contentions.  Instead, we order reversal of the trial

---

warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries."]; *Clark*, at p. 616 [although felonies listed in section 189 are deemed inherently dangerous, a defendant involved in such a felony does not automatically exhibit reckless indifference].)

29

court's order denying the petition, and remand for further proceedings.

a. *Senate Bill 1437*

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 323 (*Verdugo*), review granted Mar. 18, 2020, S260493; *People v. Munoz* (2019) 39 Cal.App.5th 738, 749–750, 763, review granted Nov. 26, 2019, S258234.)  Prior to Senate Bill 1437's enactment, under the felony-murder rule "a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–248.)  Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (See *Gentile*, at p. 842.)

As noted *ante*, Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions

30

and resentencing. A defendant is eligible for relief if he could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1170.95, subd. (a).)

Generally, evaluation of a section 1170.95 petition requires a multi-step process: an initial review to determine the petition's facial sufficiency; a prebriefing, " 'first prima facie review' " to preliminarily determine whether the petitioner is statutorily eligible for relief as a matter of law; and a second, postbriefing prima facie review to determine whether the petitioner has made a prima facie case that he or she is entitled to relief. (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 897 (*Tarkington*), review granted Aug. 12, 2020, S263219; *Verdugo*, *supra*, 44 Cal.App.5th at pp. 327–330, rev.gr.) If the court can determine, based upon its review of readily ascertainable information in the record of conviction and the court file, that the petitioner is statutorily ineligible for relief as a matter of law, it may summarily deny the petition without appointing counsel. (*Tarkington*, at pp. 898, 900–902; *Verdugo*, at p. 332; *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1139–1140, review granted Mar. 18, 2020, S260598; but see *People v. Cooper* (2020) 54 Cal.App.5th 106, review granted Nov. 10, 2020, S264684.)[11] If the petitioner's ineligibility is not established as a matter of law, the court must appoint counsel and permit briefing to determine whether the

---

[11] Our California Supreme Court is currently reviewing whether a trial court may consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under section 1170.95, and when the right to counsel arises under section 1170.95, subdivision (c). (*People v. Lewis*, S260598.)

petitioner has made a prima facie showing he or she is entitled to relief.  (*Verdugo*, at p. 330; *Tarkington*, at p. 898.)  If the petitioner makes such a showing, the court must issue an OSC and conduct a hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (§ 1170.95, subds. (c), (d); *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1166.)

Controlling here is section 1170.95, subdivision (d)(2).  That subdivision provides, in pertinent part:  "If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner."  This subdivision imposes "a mandatory duty on the court to vacate defendant's sentence and resentence him whenever there is a prior finding of this court that the defendant was not a major participant in the underlying felony and did not act with reckless indifference to human life." (*People v. Ramirez* (2019) 41 Cal.App.5th 923, 932.)  Where such a circumstance exists, the trial court must proceed directly to resentencing, rather than going through the steps of issuing an OSC and conducting a hearing.  (*Ibid.*)

b.  *Application here*

In light of our disposition of Smith's habeas petition, his arguments regarding the trial court's failure to follow the proper procedures are moot.  Based on our conclusion that the evidence did not establish he acted with reckless indifference, he is entitled to vacation of his murder conviction and resentencing.

When the trial court ruled, of course, there was no "prior" finding by an appellate court or jury that he did not act with reckless indifference.  Unlike in *Ramirez*, the trial court here did

32

not err by disregarding such a finding.  (See *People v. Ramirez*, *supra*, 41 Cal.App.5th at p. 930.)  Nonetheless, assuming the court's denial of the petition was correct at the time it ruled, it cannot now stand.  Requiring Smith to file a new section 1170.95 petition would be a waste of time and resources.  In *Ramirez*, for example, the trial court disregarded an appellate court's prior finding that the defendant was not a major participant who acted with reckless indifference.  (*People v. Ramirez*, at p. 930.)  The People conceded that the trial court's ruling was error, but nonetheless requested that the court be required to complete the steps set forth in section 1170.95, including issuance of an OSC.  (*People v. Ramirez*, at p. 930.)  *Ramirez* rejected this approach, observing that the "delay proposed by respondent would run directly counter to the statute's stated purpose of eliminating lengthy sentences which have been declared incommensurate with . . . culpability."  (*Id.* at p. 933.)

Similarly, here, requiring Smith to file a new section 1170.95 petition would be a pointless and idle act.  Instead, the more expeditious course of action is to remand to allow the trial court to reconsider Smith's section 1170.95 petition in light of our ruling on his habeas petition.

We therefore remand this matter to the trial court, with directions to vacate Smith's murder conviction pursuant to section 1170.95, subdivision (d)(2), appoint counsel, allow briefing, if requested, on the issue of resentencing, and conduct a full resentencing hearing.  (See generally *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1256.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The true finding on the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17) is vacated. The matter is remanded to the court that ruled on the section 1170.95 petition with instructions to reconsider the petition, appoint counsel for Smith, vacate his murder conviction under section 1170.95, subdivision (d)(2), and resentence him in accordance with section 1170.95, subdivision (d)(3).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

SALTER, J.*

---

\* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.